Filed 8/25/23  In re A.G. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | B322642, B326519 (Los Angeles County Super. Ct. No. 19CCJP07342B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. M.B., Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Tiana J. Murillo, Judge.  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

Alleged father M.B. (Father) appeals orders (1) denying his request to place his child A.G. with a relative and (2) terminating parental rights. (Welf. & Inst. Code, §§ 361.3, 366.26.)[1] His appellate brief solely addresses the Indian Child Welfare Act of 1978 (ICWA). (25 U.S.C.S. § 1901 et seq.; Welf. & Inst. Code, § 224 et seq.) He argues that no one asked extended family members if A.G. is Indian. (§ 224.2, subd. (b).)

Substantial evidence supports the court's finding that ICWA does not apply. Father denied Indian heritage during the proceeding and does not assert Indian heritage now. Maternal grandmother L.G. (MGM) also denied Indian heritage. Because there is no reason to believe A.G. is an Indian child, any failure to inquire of extended family members was harmless. We affirm.

## FACTS AND PROCDURAL HISTORY

Soon after A.G. was born in 2019, her mother J.G. (Mother) died. A.G. lived with MGM, her temporary legal guardian. Father was incarcerated. He was not married to Mother or named on A.G.'s birth certificate; paternity was uncertain.

Respondent Los Angeles County Department of Children and Family Services (DCFS) removed A.G. from MGM in 2019. A

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

petition alleging that MGM's home is unsafe and Father made no plan for A.G.'s care was dismissed without prejudice in February 2020. A.G. returned to MGM, who was repeatedly investigated for abuse and neglect of her children from 1998 to 2011.

After the first petition was dismissed, DCFS received a report that MGM sold drugs at her home and associated with a street gang. MGM denied drug use or current gang involvement but tested positive for marijuana and cocaine. A.G. was removed from MGM in March 2020 and placed in foster care with L.C. A.G. became very attached to L.C. and was anxious if the caregiver was not in view and holding her.

DCFS filed a dependency petition. As amended, it alleged that MGM's cocaine use endangers A.G., who requires constant care and supervision; Father is incarcerated and made no plan for A.G.'s care; and A.G. has no parent to provide supervision, care, and the necessities of life.

Father's lengthy criminal history began in 2008, when he was a juvenile. He was convicted of burglary in 2019 and is eligible for parole in 2023. He is a registered street gang participant.

Father suggested that A.G. could reside with paternal aunt E.W. (PA), or with the mother of one of his other children. MGM accused PA and Father of beating up Mother and causing her death. Father did not offer any responses to the petition. DCFS sought to bypass reunification services for him.

MGM missed seven consecutive drug and alcohol tests in April and May 2020. At meetings with social workers, she was aggressive, yelled and made threats. The probate court denied MGM's petition for legal guardianship in July 2020 because A.G. is in foster care.

Mother's death certificate lists her race as "Black, Russian, Jewish." In February 2020, MGM signed a form denying Indian heritage. She said she is "Russian Jewish and her normal food consumption includes poppy seeds" that " 'can trigger for me to test positive for cocaine.' "[2] MGM clarified, " 'My great grandmother was a Russian Jew. My great grandfather was Spanish and Italian and English.' " MGM said, " 'My mom was a little white woman and she held her ground with my dad (he was a Black man).' "

After the court ordered his transport from prison for the jurisdiction hearing, Father waived his right to appear in person and did not request a telephonic appearance. He did not respond to efforts to reach him, including letters from counsel seeking to represent him.

On September 28, 2020, the court found that Father is an alleged parent, and no reason to know that A.G. is an Indian child. It did not order notice to any tribe but ordered Father to advise his attorney, DCFS, and the court of any new information relating to possible ICWA status. It sustained allegations that A.G. has no parent to care for her because Mother is deceased and Father is incarcerated. It declared A.G. a dependent of the court. The court did not grant reunification services. It set a permanent plan hearing.

In December 2020, DCFS reported that A.G. needs a caregiver who can meet her developmental needs. MGM has unresolved substance abuse issues and a chaotic home; she is unable to rectify the situation because she denies it exists and

_____

[2] MGM also blamed her positive cocaine result on sesame seeds, cough syrup, ice cream, and fruit. She attributed her positive marijuana result to a holiday dinner cooked by a relative.

4

has not completed parenting, anger management, or drug testing programs, or counseling. MGM has a history of DCFS referrals involving her children; Father has a dependency history with his son. DCFS sent paperwork to PA but she did not seek to have her home approved for a child or undergo a live-scan. A.G.'s caregiver L.C. is an assistant school principal who has been approved for adoption.

DCFS reported that A.G. dislikes virtual visits with MGM, screaming and running from the phone. Father has no parental role in A.G.'s life but wants reunification services when he is released from prison. The court ordered DCFS to assess the home of Father's sibling, T.J. T.J. later withdrew her request for consideration.

A.G. is developing appropriately in a nurturing home and is closely bonded with L.C. In May 2021, the court named L.C. as de facto parent. The following month, Father's fiancée sought to become A.G.'s guardian. The court summarily denied her petition because it does not show new evidence or a change in circumstances.

In July 2021, a court-ordered paternity test showed a 99.99 percent probability that Father is A.G.'s biological parent. After being declared A.G.'s biological father, Father submitted a Parental Notification of Indian Status denying tribe membership or eligibility for membership; he denied that A.G. is a tribe member, or that his parents, grandparents, or other ancestors are Indians.

In September 2021, Father moved to vacate all orders because he lacked counsel at the jurisdiction hearing. DCFS and A.G. opposed the request, arguing that nothing would change because Father is not entitled to custody, visitation, or

reunification services; he is a stranger to A.G. The court decided to readjudicate the petition. The paternal grandmother (PGM) and MGM attended the hearing but the court did not ask if they are Indian.

In a new jurisdiction report, DCFS wrote that Father wishes to have custody of A.G. after he is paroled in 2023, with assistance from a former partner. The former partner was "shocked" to hear of this; she has an eight-year-old child with Father, who seldom speaks to her. MGM accused Father of arranging for Mother to be beaten and robbed, leading to her death. PGM has a criminal and dependency history; Father was raised by his aunt.

The petition was readjudicated on February 7, 2022. The court denied Father presumed parent status and sustained allegations that A.G. has no parent to provide care, supervision, and the necessities of life. It bypassed reunification services due to the length of his incarceration, lack of relationship with A.G., and status as an alleged father. DCFS was ordered to investigate placements with MGM, PA, and other proposed relatives. The court set a permanent plan hearing.

PA denied a criminal or dependency history; she lives in Oklahoma. She has one juvenile arrest for battery. She and PGM never visited A.G. because they only recently learned that A.G. is a blood relative. PA "is unable to adopt but she is willing to pursue legal guardianship" of A.G. PA "only wants to be the caregiver until [Father] is released from jail," when A.G. would be handed over to him. The court authorized monitored visits for PA.

De facto parent L.C., now a school principal, told DCFS that A.G. has been with her for over two years, is part of her

6

family, and refers to her as "mommy."  PA had one in-person visit with A.G. and four virtual visits.  A.G. greets PA during virtual visits then goes off to play.  DCFS asked the court to terminate parental rights and free A.G. for adoption.  Father has no parental role or attachment with A.G.

At a hearing on June 14, 2022, Father asked for A.G. to be placed with PA.  He reached out to his relatives when he found out that he is A.G.'s biological parent and gave their names to DCFS in February 2022.  However, he has known about A.G. since DCFS contacted him in 2020 and made no effort to propose relatives for placement for two years.  PA saw A.G. once in person, and six times virtually; she intends to give the child to Father, which is not a secure placement.  PA knew about A.G. in 2019 and did not step forward until 2022.

The court found that A.G., age three, has lived with her de facto parent nearly all her life.  Changing her placement is not in her best interest.  L.C. provides permanence, stability, and for all of A.G.'s needs.  Father appealed the order declining custody to his relatives.

DCFS reported that A.G. requested termination of parental rights and adoption.  Father appeared for the permanent plan hearing on January 17, 2023.  He asked the court to continue the case until he is released from prison.  A.G. has never met Father and does not know he exists.  The court found A.G. is adoptable and no exception to adoption applies.  It terminated parental rights and identified L.C. as the prospective adoptive parent.  Father appealed.[3]

---

[3] Father's appeals were consolidated.

## DISCUSSION

We review ICWA findings for substantial evidence. (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 777, review granted Sept. 21, 2022, S275578 (*Dezi*).) If the record shows a deficient inquiry into Indian heritage, we determine whether this invalidates findings that ICWA does not apply. (*Ibid.*) We conclude here that even if DCFS did not interview PGM or PA about possible Indian ancestry, any error is harmless. Father's claim that "no inquiry was made" of MGM is refuted by the record.

An Indian child "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C.S. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (a).) "Being an 'Indian child' is thus not necessarily determined by the child's race, ancestry, or 'blood quantum,' but depends rather 'on the child's political affiliation with a federally recognized Indian Tribe.'" (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882; *Dezi, supra,* 79 Cal.App.5th at p. 780, fn. 6, rev.gr.)

ICWA sets standards to follow if an Indian child is removed from parental custody. (*In re Austin J., supra*, 47 Cal.App.5th at pp. 881–882.) From "initial contact" with a family, DCFS and the court have "an affirmative and continuing duty to inquire" whether a child "is or may be an Indian child." (§ 224.2, subd. (a).) This means "asking the child, parents, legal guardian, Indian custodian, extended family members, [and] others who have an interest in the child . . . whether the child is, or may be, an Indian child." (*Id.*, subd. (b).) At initial appearances, the court must ask if a participant knows whether the child is Indian. (*Id.,* subd. (c).) Additional inquiry and notice to tribes is required

8

if there is "reason to believe" or "reason to know" that the child is Indian. (*Id.*, subds. (d), (e) & (f).)

Father does not claim membership in a federally recognized tribe or assert that A.G. is eligible for membership as the child of a member of an Indian tribe. (25 U.S.C.S. § 1903(4).) His ICWA form denied Indian ancestry. He was raised by and is still in touch with his mother and aunt. There is no reason to believe he does not know his own ancestry. (See *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1015 [if parents are in contact with extended family members, "the possibility that they might unknowingly be members of a tribe appears trivially small"].)

MGM identified her mother as White (Russian Jewish, Spanish, Italian and English) and her father as Black. MGM wanted custody of A.G. and was motivated to disclose Indian ancestry, if it existed. (*In re S.S.* (2022) 75 Cal.App.5th 575, 582 [a grandmother seeking custody has "a strong incentive to bring to the court's attention any facts" showing that the child is Indian].) MGM detailed her ancestry and told DCFS she is not Indian. Further questioning was unnecessary.

DCFS spoke to PA but apparently did not inquire about Indian ancestry. Nor did the court question PA when she appeared at a hearing. Extended family members include aunts and uncles. (25 U.S.C.S. § 1903(2); Welf. & Inst. Code, § 224.1, subd. (c).) Father argues that this lapse mandates reversal. Like MGM, PA sought custody of A.G. and had a strong incentive to disclose Indian heritage to the court.

Some courts have held that failure to question extended family members requires automatic reversal "no matter how 'slim' the odds are that further inquiry on remand might lead to a different ICWA finding by the juvenile court." (*Dezi, supra,* 79

9

Cal.App.5th at p. 777, rev.gr.)  We do not follow the automatic reversal rule.  (*Id*. at pp. 782–785.)

"In our view, an agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding.  For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*Dezi*, *supra,* 79 Cal.App.5th at p. 779, fn. omitted, rev.gr.)

There is no reason to believe A.G. is an Indian child. Father denies Indian heritage.  Unlike the parent in *In re Y.W.* (2021) 70 Cal.App.5th 542, 548, who was adopted at age two and lacked information about her biological family, there is no similar concern for Father.  He points to nothing in the record indicating Indian heritage nor does he make a proffer on appeal of such heritage.  (*Dezi, supra,* 79 Cal.App.5th at p. 786, rev.gr.)

A judgment cannot be set aside unless it has resulted in a miscarriage of justice, meaning "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Dezi, supra,* 79 Cal.App.5th at p. 779, rev.gr.; Cal. Const., art. VI, § 13.)

Father has not shown a miscarriage of justice.  He denied Indian heritage to DCFS, and never said anything to the contrary to the court.  Because Father denied Indian ancestry, there is no reason to believe his sister PA is Indian.  Father's attorney did not object to the adequacy of the ICWA inquiry, or to the court's

ICWA findings, or suggest that Father has Indian ancestry. (*In re Ezequiel G., supra,* 81 Cal.App.5th at p. 1013.)

Courts discourage "game playing by parents who hold back any objection to the adequacy of the [ICWA] inquiry until an appeal of the termination of their parental rights in hopes of delaying the finality of the termination." (*Dezi, supra,* 79 Cal.App.5th at p. 781, rev.gr.) Father's unsupported assertion of ICWA error is a fruitless effort to delay, without a showing that interviews with PA or other relatives would disclose Indian ancestry. (See *In re Darian R.* (2022) 75 Cal.App.5th 502, 510.)

## DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

ASHMANN-GERST, J.

CHAVEZ, J.

11